IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DAVID PADILLA,

     Plaintiff,

    vs.                                                                 Civ. No. 16-106 KK

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

     Defendant.

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16) filed May 16, 2016, in support of Plaintiff David Padilla's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Commissioner") denying Plaintiff′s claims for Title II disability benefits and Title XVI supplemental security income benefits.  On September 19, 2016, Plaintiff filed his Motion to Reverse and Remand to Agency for Rehearing, with Supporting Memorandum ("Motion").  (Doc. 23.)  The Commissioner filed a response in opposition to the Motion on November 18, 2016 (Doc. 25), and Plaintiff filed a reply in support of it on December 2, 2016.  (Doc. 26.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to Federal Rule of Civil Procedure 25, Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration.  Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to order the entry of judgment, in this case.  (Docs. 5, 8, 9.)

## I.  Background and Procedural History

Claimant David Padilla ("Mr. Padilla") alleges that he became disabled on September 1, 1994, at twenty-eight years of age, because of hepatitis C and alcoholism.  (Tr. 189, 192, 415.[3]) Mr. Padilla graduated from high school, served a short time in the U.S. Navy, and has worked as a general laborer, wheelchair attendant, and shuttle driver.  (Tr. 212-213, 300, 503.)

On January 12, 2009, Mr. Padilla protectively[4] filed an application for Social Security Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401, and concurrently filed an application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*  (Tr. 189-91, 192-93, 289.)   Mr. Padilla's applications were initially denied on April 16, 2009, and denied again at reconsideration on June 26, 2009.  (Tr. 80-81, 83-84, 87-93, 95-101.)  On August 12, 2009, Mr. Padilla requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 102-03.)  The ALJ conducted a hearing on May 21, 2010, and issued an unfavorable decision on September 22, 2011.  (Tr. 12-28, 35-78.)  The ALJ found Mr. Padilla not disabled at step five of the five-step sequential evaluation process, and determined that, "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform[.]"  (Tr. 27.)  On December 12, 2012, the Appeals Council issued its decision denying Mr. Padilla's request for review and upholding the ALJ's final decision.  (Tr. 1-11.)

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record that was lodged with the Court on May 16, 2016.  (Doc. 16.)

[4] Protective filing status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability Benefits.  The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application.  *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345

On January 31, 2013, Mr. Padilla timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (USDC Civ. No. 13-103 GBW, Doc. 1.)  The parties fully briefed the issues raised for judicial review.  (*Id.*, Docs. 24, 27, 28, 29.)  On September 25, 2014, Magistrate Judge Gregory B. Wormuth, presiding by consent, entered a Memorandum Opinion and Order remanding Mr. Padilla's case for further administrative proceedings.  (*Id.*, Doc. 30; Tr. 670-92.)   Judge Wormuth found that the ALJ had erred in his credibility assessment pertaining to the intensity of Plaintiff's symptoms, and remanded to ensure that the ALJ applied the correct legal standard in reaching a decision based on the facts of the case.  (Tr. 690-91.)

On November 7, 2014, the Appeals Council entered an Order Remanding Case to Administrative Law Judge directing the ALJ to reevaluate Mr. Padilla's credibility.  (Tr. 695-96.)  The Appeals Council directed the ALJ to offer Mr. Padilla the opportunity for a hearing, to take any further action needed to complete the administrative record, and to issue a new decision. (*Id.*)  On May 29, 2015, ALJ Eric Weiss conducted a hearing pursuant to the Appeals Council's order remanding the case.  (Tr. 612-659.)  Mr. Padilla appeared in person at the hearing with his attorney Gary Martone.  (*Id.*)  The ALJ took testimony from Mr. Padilla, (Tr. 617-649), and from an impartial Vocational Expert ("VE"), Karen Provine. (Tr. 649-59.)

On July 17, 2015, the ALJ issued an unfavorable decision.  (Tr. 584-604.)  In arriving at his decision, the ALJ determined that Mr. Padilla met the insured status requirement through December 31, 2000.[5] (Tr. 590.)  He found that Mr. Padilla engaged in substantial gainful activity in 2006, but that there had been continuous 12-month periods during which Mr. Padilla had not engaged in substantial gainful activity since his alleged onset date.  (*Id.*)  The ALJ found that Mr. Padilla suffered from the severe impairments of cirrhosis of the liver, hepatitis C,

---

[5] To receive disability benefits, a claimant must show he was disabled prior to his date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

degenerative disc disease, osteoarthritis in the lower leg, personality disorder, adjustment disorder, and depressive disorder. (*Id.*) The ALJ further found that these impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 590-93.)

Because he found that Mr. Padilla's impairments did not meet or equal a listed impairment, the ALJ went on to assess Mr. Padilla's residual functional capacity ("RFC"). The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is able to lift twenty pounds occasionally and lift or carry ten pounds frequently, and push or pull the same. He is able to walk or stand for six hours per eight-hour day and sit for six hours per eight-hour day with normal breaks. He may occasionally climb ramps and stairs, but never ladders, ropes and scaffolds. He may occasionally stoop, crouch, kneel and crawl. He must avoid more than frequent exposure to extreme cold, unprotected heights and moving machinery. He is able to understand, remember, and carry out simple instructions and make commensurate work related decisions and adjust to routine changes in the work setting. He is able to maintain concentration, persistence, and pace for two hours at a time throughout the workday with normal breaks.

(Tr. 594.) Based on the VE's testimony, the ALJ concluded that Mr. Padilla was unable to perform any past relevant work, but that considering Mr. Padilla's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Padilla could perform, and he was therefore not disabled. (Tr. 602-04.)

On December 17, 2015, the Appeals Council issued its decision denying Mr. Padilla's request for review and upholding the ALJ's final decision. (Tr. 575-79.) On February 11, 2016, Mr. Padilla timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[6] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues *de novo*.  *Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  Substantial evidence is "more than a scintilla, but less than a preponderance."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).  The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence."  *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir.

---

[6] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and the Court will therefore review the ALJ's decision as the Commissioner's final decision.

2004)).  Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*."  *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).  As such, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."  *Id.* at 1009-10.  Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III.  Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  To qualify for disability insurance benefits, a claimant must establish a severe physical or mental

impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520 and 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[7] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If the claimant can show that his impairment meets or equals a listed impairment at step three, the claimant is presumed disabled.  However, if at step three the claimant's impairment does not meet or equal a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.  20 C.F.R. §§ 404.1545(a)(1)-(3), 416.945(a)(1)-(3).  This is the claimant's RFC.  20 C.F.R. §§ 404.1545(a)(1) & (a)(3), 416.945(a)(1) & (a)(3).  The claimant's RFC is used at step four to determine if he can perform his past relevant work.  20 C.F.R. §§ 404.1520(a)(4), 404.1520(e), 416.920(a)(4), 416.920(e).  If the claimant establishes that he cannot, the burden of proof then shifts to the Commissioner at step five of the sequential evaluation process, to show that the claimant is able to perform other

---

[7] 20 C.F.R. pt. 404, subpt. P. app. 1.

work in the national economy, considering his RFC, age, education, and work experience.  *Id.*; *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  *Hawkins*, 113 F.3d at 1167.

## IV.  <u>Analysis</u>

Mr. Padilla asserts two arguments in support of his Motion: (1) the ALJ did not properly assess Mr. Padilla's RFC; and, (2) the ALJ erred at step five in finding that other jobs Mr. Padilla can perform exist in significant numbers.  (Doc. 23 at 9-15.)  The Court finds that the ALJ applied the correct legal standards in assessing Mr. Padilla's RFC and finding that other jobs Mr. Padilla can perform exist in significant numbers, and substantial evidence supports his determinations.

A.    **RFC**

Mr. Padilla argues that substantial evidence does not support the ALJ's assessment of Mr. Padilla's RFC.  (Doc. 23 at 9-12.)  Specifically, Mr. Padilla argues that the ALJ failed to properly consider Mr. Padilla's ability to sustain work activities and his complaints of fatigue and pain.  (*Id.*)  The Commissioner responds that the ALJ carefully considered the entire record, including Mr. Padilla's statements regarding the intensity, persistence, and limiting effects of his symptoms, and that substantial evidence supports the ALJ's determination of Mr. Padilla's RFC. (Doc. 25 at 4-10.)

Assessing a claimant's RFC is an administrative determination left solely to the Commissioner "based on the entire case record, including objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009); see also 20 C.F.R. §§ 404.1546(c) and 416.946(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (an individual's RFC is an administrative finding).  In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record.  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. §§ 404.1545(a)(2) and (3) and 416.945(a)(2) and (3).  The ALJ must consider and address medical source opinions and give good reasons for the weight accorded to a treating physician's opinion.  20 C.F.R. § 404.1527(c)(2); SSR 96-8p, 1996 WL 374184, at *7.  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p, 1996 WL 374184 at *7.    Further, the ALJ's "RFC

assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at \*7). When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion with citations to specific medical facts and nonmedical evidence, the court will conclude that his RFC assessment is not supported by substantial evidence. *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003). The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003) (unpublished).

Here, the ALJ's RFC assessment that Mr. Padilla is able to do light unskilled work is sufficiently articulated and supported by substantial evidence. *Langley*, 373 F.3d at 1118. The ALJ's RFC assessment included an organized and thorough narrative of Mr. Padilla's impairments, medical history and records, medical source statements, hearing testimony, and third-party statement. (Tr. 594-602.) The ALJ applied the correct legal standards in evaluating the medical evidence by explaining the weight he accorded to the State agency examining medical consultants.[8] *See Hamlin*, 365 F.3d at 1215 ("If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it.") The ALJ discussed the assessments of Dr. Amy Kogut and Dr. Natavan Karimova regarding Mr. Padilla's ability to do work-related physical activities and explained why he determined that Mr. Padilla was capable of doing light work.[9] The ALJ discussed the conflict between Dr. Barbara

---

[8] The Administrative Record includes no treating source opinions regarding Mr. Padilla's RFC.

[9] The ALJ accorded great weight to Dr. Kogut's opinion that Mr. Padilla's hepatitis C did not appear to significantly limit his physical function. (Tr. 396, 595.) The ALJ also accorded great weight to Dr. Karimova's opinion that Mr. Padilla was capable of medium work. (Tr. 510, 598.) The ALJ explained, however, that he did not find claimant to be capable of medium work because radiologic studies of Mr. Padilla's knees and cervical and lumbar spine demonstrated mild degenerative changes. (Tr. 539-44, 598.) The ALJ also stated that, based on these findings, he limited Mr. Padilla to occasional stooping and crouching. (*Id.*)

May-Valencia's and Dr. Cathy Simutis' opinions regarding Mr. Padilla's ability to do work-related mental activities, and adequately explained the weight he accorded each of their opinions and why he accorded less weight to Dr. May-Valencia's opinion.[10]  The ALJ properly considered the relevant factors and the evidence in making his credibility determination.  Finally, the ALJ thoroughly explained how the evidence supported his conclusions.

### 1.  Sustained Work Activities

Mr. Padilla specifically argues that the ALJ failed to focus on Mr. Padilla's ability to sustain work activities and that the record clearly supported Mr. Padilla's reports that he was unable to work due to fatigue.[11]  (Doc. 23 at 10.)  SSR 96-8p instructs that, in assessing RFC, "the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  SSR 96-8p, 1996 WL 374184, at *7.   Tenth Circuit case law instructs that an ALJ's findings regarding a claimant's ability to sustain work activities are sufficient when they are not general, specifically

---

[10] On March 20, 2009, Dr. May-Valencia diagnosed Mr. Padilla with mood disorder with mixed features due to hepatitis C, polysubstance dependence in full remission, and a personality disorder.  (Tr. 385.)  She assigned a GAF score of 48 indicating serious mental health symptoms.  (*Id.*)  On August 11, 2011, Dr. Simutis diagnosed Mr. Padilla with adjustment disorder with depressed mood, personality disorder, and chronic pain due to medical condition.  (Tr. 504.)  She assigned a GAF score of 55 indicating moderate mental health symptoms.  (Tr. 505.)  Dr. Simutis assessed only mild limitations in Mr. Padilla's ability to do work-related mental activities.  (*Id.*)  The ALJ gave more weight to Dr. Simutis' opinion than to Dr. May-Valencia's opinion.  (Tr. 595.)  He explained that Dr. Simutis had a more complete set of medical records.  (*Id.*)  In addition, he found Dr. May-Valencia to be overly sympathetic to Mr. Padilla's presentation at the examination and to his attempts to adapt to life after incarceration. (*Id.*)  The Court's review of the record indicates that Mr. Padilla reported to Dr. May-Valencia on March 20, 2009, that he was living on the street in his car, in contrast to his February 26, 2009 statement in his Adult Function Report, that he had recently moved in with his mother.  (Tr. 386.)  Mr. Padilla also reported to Dr. May-Valencia that he had attempted suicide several times in the past.  (Tr. 386.)  However, on August 11, 2011, Mr. Padilla reported to Dr. Simutis that he had made only one suicide attempt, when he was a teenager; and, on August 29, 2011, Mr. Padilla reported to Dr. Karimova that he never had suicidal thoughts or ideation and had never attempted suicide.  (Tr. 503, 507.)

[11] Although the ALJ found that Mr. Padilla's medically determinable impairments could reasonably be expected to cause his alleged symptoms, he found that Mr. Padilla's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible.  (Tr. 594); *see* Section IV.A.2., *infra*.

account for a claimant's exertional abilities, and are based on the medical evidence of record. *See Wells*, 727 F.3d at 1075 (finding that the ALJ's discussion regarding the claimant's ability to sustain work activities was sufficient where the findings were not general, but accounted for specific exertional abilities that were supported by a discussion of the medical evidence record).

Here, the ALJ's findings are more than sufficient and clearly apply correct legal standards. The ALJ discussed the exertional strength demands required for light work. Based on medical opinion evidence,[12] the ALJ determined that Mr. Padilla was able to lift twenty pounds occasionally and lift or carry ten pounds frequently, and push or pull the same, walk or stand for six hours *per eight-hour day*, and sit for six hours *per eight-hour day* with normal breaks. (Tr. 593.) Thus, the ALJ specifically addressed Mr. Padilla's ability to perform and sustain the seven strength demands related to exertional capacity, *i.e.,* sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 96-8p, 1996 WL 374184, at *5.

The ALJ also addressed Mr. Padilla's nonexertional capacity for work-related activities. For example, he assessed postural limitations related to climbing ramps, stairs, ladders, ropes, and scaffolds, and to stooping, crouching, kneeling and crawling. (Tr. 593.) The ALJ assessed environmental limitations related to extreme cold, unprotected heights, and moving machinery. (Tr. 594.) Finally, the ALJ considered Mr. Padilla's residual capacity to perform work-related mental activities. Based on medical opinion evidence,[13] the ALJ assessed that Mr. Padilla was able to understand, remember, and carry out simple instructions, make commensurate work related decisions, adjust to routine changes in the work setting, and maintain concentration, persistence, and pace for two hours at a time *throughout the workday* with normal breaks. (Tr.

---

[12] *See* fn. 9, *supra*.

[13] The ALJ accorded great weight to Dr. Simutis' opinion that Mr. Padilla had mild limitations in his ability to perform work-related mental activities. (Tr. 505, 598.)

594.)  Thus, the ALJ complied with the requirements of SSR 96-8p and made specific findings regarding the maximum amount of work-related activity that Mr. Padilla could perform on a sustained basis in an ordinary work setting.  SSR 96-8p, 1996 WL 374184, at *7.  As such, there is no error in the ALJ's RFC assessment as to this issue.  *Wells*, 727 F.3d at 1075.

## 2.    Credibility Assessment

Mr. Padilla also argues that the ALJ failed to properly credit his complaints of fatigue and pain in determining his RFC.  (Doc. 23 at 10-12.)  More specifically, Mr. Padilla argues that the ALJ failed to consider that his persistent efforts to obtain treatment for his pain and fatigue enhanced his allegations of disability.  (Doc. 23. at 11.)  "A claimant's subjective allegation of pain is not sufficient in itself to establish disability."  *Thompson*, 987 F.2d at 1488 (citing *Gatson v. Bowen*, 838 F.2d 442, 447 (10th Cir. 1988)).  Instead, before an ALJ need even consider any subjective evidence of pain or other symptoms, the claimant must first prove by objective medical evidence the existence of a pain or fatigue producing impairment that could reasonably be expected to produce the alleged disabling pain and fatigue.  *Id.* (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)).  If a claimant does so, the ALJ must then consider whether there is a "loose nexus" between the proven impairment and the subjective complaints of pain.  *Id.*  If there is a loose nexus, the ALJ considers all of the evidence, both objective and subjective, to determine whether the pain is disabling.  *Id.*  Even if pain is not disabling, it "is still a nonexertional impairment to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's pain is insignificant."  *Thompson*, 987 F.2d at 1491.

The first step in the three-step analysis of subjective symptoms is to determine whether objective medical evidence demonstrates the existence of a pain- or other symptom-producing impairment.  Here, the ALJ determined that Mr. Padilla had the severe impairments of cirrhosis

of the liver, hepatitis C, degenerative disc disease, osteoarthritis in the lower leg, personality disorder, adjustment disorder, and depressive disorder.  (Tr. 590.)  Thus, Mr. Padilla proved by objective medical evidence the existence of pain- and fatigue-producing impairments. *Thompson*, 987 F.2d at 1488.  As such, the ALJ was required to determine whether there is a "loose nexus" between Mr. Padilla's proven impairments and his subjective complaints, and then decide whether Mr. Padilla's complaints of disabling pain and fatigue are credible.  *Id.* at 1489. The ALJ did so here.  (Tr. 594, 595-602.)

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)).  Nevertheless, an ALJ's credibility finding "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.; see also* SSR 16-3p, 2016 WL 1119029, at *9 ("[I]t is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'").  When assessing a claimant's credibility, the ALJ considers:

(1) The claimant's daily activities;
(2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
(3) Factors that precipitate or aggravate the symptoms;
(4) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate symptoms;
(5) Treatment, other than medication, the claimant receives or has received for his symptoms;
(6) Any measures other than treatment the claimant uses or has used to alleviate his symptoms;
(7) Any other factors concerning the individual's functional limitations and restrictions due to his symptoms.

SSR 96-7p[14], 1996 WL 374186, at *2.  Further, in determining the credibility of pain testimony, the ALJ should also ordinarily consider such factors as

> the frequency of medical contacts, . . . subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Thompson*, 987 F.2d at 1488 (citing *Hargis v. Sullivan*, 945, F.2d 1482, 1489 (10th Cir. 1991) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988))).  Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth specific evidence he relies on in evaluating the claimant's credibility."  *Poppa v. Astrue*, 569 F.3d at 1171 (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)); *see also Thompson*, 987 F.2d at 1490 (no "talismanic requirement that each factor . . . be addressed").

In the present matter, the ALJ addressed many of these factors when evaluating Mr. Padilla's claims and the ALJ's credibility findings are closely and affirmatively linked to substantial evidence.  In reaching his credibility determination, the ALJ discussed the medical evidence, function reports, and Mr. Padilla's testimony.  (Tr. 594-602.)  In terms of daily activities, the ALJ discussed the inconsistency of Mr. Padilla's reports of his daily activities, both internally and with other record evidence.  (Tr. 600.)  For instance, the ALJ discussed that, in his February 26, 2009 Adult Function Report, Mr. Padilla indicated that he required assistance to dress, bathe, care for his hair, and shave, and required prompting to brush his teeth and reminders to take his medications.[15]  (*Id*.)  Mr. Padilla also reported that he was unable to do any

---

[14] On March 16, 2016, the Social Security Administration superseded SSR 96-7p when it issued SSR 16-3p, 2016 WL 1119029.  It became effective on March 28, 2016.  SSR 16-3p, 2016 WL 1237954, at *1.  SSR 96-7p was in effect at the time of the ALJ's determination in this case.

[15] Mr. Padilla was living with his mother at this time.  (Tr. 245, 260.)

household chores because of constant pain and fatigue. (*Id.*) On February 20 and 25, 2009, however, Mr. Padilla's mother reported that he was able to dress, bathe, groom, feed, and toilet himself independently, that he was able to drive a car and shop at the grocery store, and that he did not require any reminders to take his medications. (*Id.*) The ALJ also discussed that on March 28, 2009, Mr. Padilla reported to Dr. Kogut that he could stand for about one hour out of a total of eight hours, walk on level ground for about two hours or one mile, sit without problems, lift 30 to 50 pounds, drive a car, and do household chores such as sweeping, mopping, vacuuming, cooking, and washing dishes. (*Id.*) The record supports these findings. (Tr. 246-47, 254-55, 255-56, 394.)

The Court's review of the record further demonstrates that on August 11, 2011, Mr. Padilla reported to Dr. Simutis that he showered every other day and dressed daily, and was able to fix meals, grocery shop, and do laundry. (Tr. 504.) He also reported that he spent his days taking care of his mother, watching television, reading the paper, doing crossword puzzles, and cleaning up after himself. (*Id.*) On August 29, 2011, Mr. Padilla reported to Dr. Karimova that he could take care of, feed, dress, and bathe himself. (Tr. 507.) He also reported that he cooked, did dishes, vacuumed, and mopped. (*Id.*) Dr. Karimova further noted that although Mr. Padilla complained of lumbar pain, he was able to flex down and take his shoes off and put them back on without any problems. (Tr. 510.) On April 29, 2015, Mr. Padilla testified he could cook for himself and shower. (Tr. 647.) Thus, the record fully supports the ALJ's finding that Mr. Padilla provided inconsistent descriptions of his daily activities, and that his descriptions were also inconsistent with his mother's observations. This is a proper basis on which to discount Mr. Padilla's credibility. *See* 96-7p, 1996 WL 374186, at \*5-\*6[16] (adjudicator will

---

[16] *See* fn. 14, *supra*. The corresponding reference in the current SSR is found at SSR 16-3p, 2016 WL 1119029, at \*8.

consider the consistency of the individual's own statements with other information in the case record, including observations and statements made under other circumstances).

The ALJ also discussed the fact that Mr. Padilla made inconsistent reports to healthcare providers about his alcohol use.  (Tr. 600.)  Specifically, the ALJ discussed that on April 27, 2010, Mr. Padilla told caregivers at Healthcare for the Homeless that he had been sober for two years, but that on May 15, 2010, he was transported by paramedics to the University of New Mexico Hospital ("UNMH") emergency room for intoxication, loss of consciousness, and assault.  (*Id.*)  The ALJ also discussed Mr. Padilla's testimony that he had had drinking lapses "four or five times" or "a few times" since he was released from prison in 2005.  (*Id.*)  The record supports these findings.  (Tr. 493, 496, 638-42, 647.)  The Court's review of the record further demonstrates that on March 28, 2009, Mr. Padilla reported to Dr. Kogut that his alcoholism was not an active problem for him and that he drank about four beers every two weeks.  (Tr. 394.)  On March 22, 2010, Mr. Padilla was transported by paramedics to the emergency room of the Christus Saint Vincent Regional Emergency Medical Center for intoxication and assault.  (Tr. 458-89.)  On May 11, 2011, Mr. Padilla told healthcare providers at the University of New Mexico ("UNM") Gastroenterology Clinic that he had not used alcohol since the early 1990s, while on September 7, 2011, he told them that he had had no alcohol for two years, and on December 9, 2011, that he consumed one to two beers at a time every two weeks.  (Tr. 535, 547, 568.)  On July 10, 2012, Mr. Padilla reported to healthcare providers at the UNM Orthopedic Clinic that he did not drink.  (Tr. 896.)  On October 7, 2012, Albuquerque Police Department officers found Mr. Padilla "down and out"; he was taken to the UNMH's emergency department, where he reported that he had drunk twelve beers.  (Tr. 892.)  On August 23, 2013, Mr. Padilla reported to healthcare providers at the UNM Gastroenterology

Clinic that he "rarely" drank alcohol and that his last drink was two weeks ago. (Tr. 887.) On January 10, 2014, healthcare providers at the UNM Gastroenterology Clinic noted that Mr. Padilla reported he had been alcohol free for seven months, but that he failed to report being taken by ambulance to the UNMH emergency room on November 9, 2013, for intoxication, where he had a blood alcohol level of 411 milligrams per deciliter and left without seeing a provider. (Tr. 884-85.) Thus, the record amply supports the ALJ's finding that Mr. Padilla made inconsistent reports to healthcare providers about his alcohol use. This is also a proper basis on which to discount Mr. Padilla's credibility. 96-7p, 1996 WL 374186, at *5-*6[17]; *see also Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ properly relied on inconsistent statements about claimant's alcohol use to support negative conclusions about claimant's veracity).

The ALJ also discussed that caregivers had expressed doubt about Mr. Padilla's credibility. (Tr. 600.) For instance, the ALJ noted that on May 11, 2010, Mr. Padilla presented to Healthcare for the Homeless seeking "levels" for his hepatitis C in preparation for his upcoming disability hearing. (*Id.*) The ALJ stated that Mr. Padilla also requested a motel voucher, alleging he had "new back pain" that did not allow him to carry bags for his roommate anymore. (*Id.*) As the ALJ discussed, healthcare providers noted that Mr. Padilla was "tense, manipulative, poorly redirected/focused," and in no acute distress. (*Id.*) The record supports this finding, which is a proper basis on which to assess Mr. Padilla's credibility. (Tr. 491); 96-7p, 1996 WL 374186, at *5-*6.[18]

---

[17] *See* fn. 16, *supra.*

[18] *See* fn. 16, *supra.*

The ALJ discussed that Mr. Padilla had not received psychiatric care or treatment since he left prison in 2005,[19] and that he had not been compliant with doctors' instructions regarding psychiatric medications.  (Tr. 601.)  Before the ALJ may rely on the claimant's failure to pursue treatment or take medication to support his determination of noncredibility, he or she should consider "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and if so, (4) whether the refusal was without justifiable excuse."  *Thompson*, 987 F.2d at 1490.  The ALJ did not explicitly address these factors here.[20]  However, the balance of the ALJ's credibility analysis is supported by substantial evidence in the record and any error in not directly addressing these factors is harmless.  *See Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004) (although the court expressed concern that the ALJ had relied on claimant's failure to pursue treatment to find claimant's allegations of disabling pain were not credible, the court found that the balance of the ALJ's credibility analysis was supported by substantial evidence).

Mr. Padilla argues that the ALJ should have focused on Mr. Padilla's persistent efforts to obtain treatment for his pain and fatigue due to hepatitis C.  (Doc. 23 at 11-12.)  The Court is not

---

[19] Mr. Padilla was in prison from 1994 to 2005.  (Tr. 386, 394, 503.)

[20] The ALJ did indirectly address these factors.  The ALJ noted that healthcare providers at the UNM Gastroenterology Clinic first told Mr. Padilla on December 9, 2011, that his score on the depression screen was too high for hepatitis C treatment.  (Tr. 569, 599.)  They instructed Mr. Padilla to completely stop smoking and drinking and to return in three months.  (*Id.*)  On March 2, 2012, Mr. Padilla returned and stated that due to a recent ankle injury he was not interested in pursuing hepatitis C treatment.  (Tr. 898-99.)  Mr. Padilla returned to the clinic seventeen months later on August 23, 2013, and was told again that he was not a good candidate for hepatitis C treatment because of his depression score.  (Tr. 599, 888.)  The record supports that Mr. Padilla was referred for psychiatric treatment, and that "[i]f this [could] be addressed, then the patient might be a good candidate."  (Tr. 888.)  The ALJ discussed Mr. Padilla's testimony that healthcare providers prescribed Zoloft for his depression, but that he never took it because he believed they "told [him] to save it" until he started treatment for his hepatitis C.  (Tr. 602, 636, 643.)  Elsewhere in the determination, the ALJ discussed that Mr. Padilla told Dr. Simutis on August 11, 2011, that he had been prescribed anti-depressants in the past and took them for one day but stopped because the side effects, *i.e.*, a decreased libido, outweighed the benefits.  (Tr. 503, 507, 510, 597.)  The record further supports that Mr. Padilla received a referral for psychiatric treatment on August 23, 2013, but on January 10, 2014 reported that "they were unable to treat him."  (Tr. 884.)  He also reported that he had gotten a prescription from his primary care provider for an anti-depressant, but had not filled it.  (*Id.*)

persuaded. The ALJ did discuss Mr. Padilla's efforts to obtain treatment for, and the medical findings related to, his hepatitis C[21] as well as his musculoskeletal pain.[22] (Tr. 597-99.) The ALJ also questioned Mr. Padilla at length at the Administrative Hearing about his efforts to obtain treatment for hepatitis C and the status of his back and knee pain. (Tr. 636-45.) The ALJ discussed Mr. Padilla's testimony as follows:

> [Mr. Padilla] described his symptoms as muscle weakness, lack of energy, and fatigue. He said he felt like there was "no blood in [his] system" and he complained of severe fatigue. He explained he had suffered from hepatitis C for twenty-five years and the hepatitis C had led to cirrhosis. His body had "shut down." The claimant testified he had only had a few drinks since his release from prison, and he did not have a drug problem. He said he had never had a positive drug test and he had never been charged for a drug-related offense.

> [Mr. Padilla] testified he had been incarcerated from 1995 through 2004. After he was released from prison, he worked through a temporary agency. His chronic fatigue made it difficult for him to maintain attendance. He was fired from jobs for missing too much work. He left other jobs because he could not do the work. The claimant described his primary problem as fatigue with back pain and spasms. He also had problems with his knees, and doctors had given him injections in the knees.

> [Mr. Padilla] admitted he had never been treated for hepatitis C. Doctors told him he was not an "appropriate candidate." He testified he was attempting to get treatment at the time of the hearing but doctors had insisted he take care of some dental problems before starting a treatment program.[23] He had to wait for

---

[21] The ALJ discussed that Mr. Padilla reported to Dr. Kogut that he was diagnosed with hepatitis C in 1994, but that he did not see a gastroenterologist for his hepatitis C until May 11, 2011. (Tr. 595, 597.) The ALJ also discussed that Mr. Padilla presented six times to the UNM Gastroenterology Clinic over the course of four years – three times in 2011, once in 2012, once in 2013, and once in 2014; providers at this clinic instructed him to completely stop drinking and smoking. (Tr. 597-99.) He was informed on December 9, 2011, and again on August 23, 2013, that he was not a good candidate for hepatitis C treatment due to his depression score. (*Id.*) At his last visit, on January 20, 2014, providers noted their concern that Mr. Padilla reported he had been sober for seven months, but failed to report a recent visit to the UNMH emergency department for alcohol intoxication with a blood alcohol level of .411. (*Id.*) The record supports these findings. (Tr. 394, 535-36, 546-48, 567-69, 884-88, 898-99.)

[22] The ALJ discussed Mr. Padilla's radiologic studies for knee and back pain in May 2011. (Tr. 597.) The ALJ discussed that: (1) on January 7, 2015, Mr. Padilla had bilateral knee steroid injections, (Tr. 599); (2) on February 24, 2015, he had trigger point injections for his neck and lumbar spine, which were partially helpful, (Tr. 600); and, (3) on May 22, 2015, an MRI of his lumbar and cervical spine was unremarkable. (*Id.*) The record supports these findings. (Tr. 539, 541, 543, 860-62, 871-72, 976-77, 932-33.)

[23] Mr. Padilla stated that he had not taken care of a wisdom tooth that required pulling because he was "tired of needles." (Tr. 638.)

insurance coverage to get the treatment he needed.[24]  The claimant argued that his
occasional use of alcohol was not the reason he was not receiving treatment for
hepatitis C.  The claimant testified he was taking no anti-depressant medications
at the time of the hearing.  He admitted doctors had prescribed Zoloft, but he said
he was "saving it" until he started treatment for hepatitis C.

The claimant testified he had suffered from back pain for many years.  Doctors
had given him trigger point injections that seemed to help his neck but not his low
back.  He was scheduled to have an MRI and to see a spine specialist.  The
claimant also complained of knee pain.  He said injections in his knees had been
helpful for about two months, but he had to wait four months between injections.

(Tr. 602.)  Mr. Padilla also testified that prison healthcare providers had offered him treatment

for hepatitis C while in prison, but that he did not have it because it was too close to his release

and he would not have been able to finish the treatment.  (Tr. 634.)  Mr. Padilla testified that

when he was released from prison he needed to work, did not have insurance, and did not know

he was eligible for insurance through University of New Mexico Care.  (*Id*.)  He further testified

that he obtained insurance in 2009.  (*Id*.)

Ultimately the ALJ determined that Mr. Padilla's allegations of disabling pain and fatigue

were not entirely credible because the descriptions of his daily activities were inconsistent, his

reported use of alcohol to healthcare providers was inconsistent, and other healthcare providers

expressed doubt regarding Mr. Padilla's truthfulness.   (Tr. 600-01.)   The ALJ further

summarized that his RFC was supported because there was an absence of urgency on the part of

doctors regarding treatment of Mr. Padilla's hepatitis C, the medical treatment provided was

conservative, and the radiologic studies of Mr. Padilla's back, neck, and knees were benign.  (Tr.

602.)  The record supports these findings.

---

[24]  At the Administrative Hearing on May 29, 2015, Mr. Padilla testified that he qualified for Medicaid in June/July
2014 and began taking care of his teeth as instructed.  (Tr. 636-38.)  He also testified that he had not seen providers
at the UNM Gastroenterology Clinic since January 20, 2014, but was trying to get an appointment.  (Tr. 637.)

The ALJ properly evaluated Mr. Padilla's allegations of pain and fatigue in light of the relevant credibility factors and supported his credibility finding with specific evidence. *Poppa*, 569 F.3d at 1171; *see Kepler*, 68 F.3d at 391 ("[W]e will not upset credibility determinations when supported by substantial evidence."). Because the ALJ applied the correct legal standards in evaluating the evidence, and substantial evidence supports his credibility determination, the Court will not disturb the ALJ's findings in this regard.

### B.     Step Five Findings

Mr. Padilla argues that the ALJ erred at step five in finding that other jobs Mr. Padilla can perform exist in significant numbers. (Doc. 23 a 12-15.) Specifically, Mr. Padilla argues that there is no indication the ALJ analyzed the factors listed in *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992), in making this finding. (*Id.*) Mr. Padilla further argues that, based on the number of jobs the VE identified in the national economy, there are not a significant number of jobs Mr. Padilla could perform in New Mexico. (*Id.*) The Commissioner argues that Mr. Padilla's reliance on *Trimiar* is inapposite because in that case the VE testified only to the number of jobs available in the regional economy, while here the VE testified to the number of jobs available in the national economy; and, Mr. Padilla has not argued that the number of jobs available nationally is insignificant. (Doc. 25 at 10-11.)

The Tenth Circuit has emphasized that "the issue of numerical significance entails many fact-specific considerations requiring individualized evaluation" and, as such, "the evaluation 'should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation.'" *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004) (quoting *Trimiar*, 966 F.2d at 1330). In *Trimiar*, the issue was whether 650 to 900 jobs existing in the region constituted a significant number. 966 F.2d at 1329-32. The court

noted several factors courts may consider in evaluating the "significant number" issue, including: (1) the level of claimant's disability; (2) the reliability of the vocational expert's testimony; (3) the distance claimant is capable of traveling to engage in the assigned work; (4) the isolated nature of the jobs; and, (5) the types and availability of such work. *Id.* at 1330. The court ultimately determined that the ALJ had considered these factors, and that substantial evidence supported his decision. *Id.* at 1332.

A number of subsequent Tenth Circuit cases have addressed the application of *Trimiar* and the issue of what constitutes a significant number of jobs. In *Allen*, the court remanded when it determined that the ALJ had erroneously relied on two jobs that were in direct conflict with his RFC findings to find that significant jobs existed, and that "he never had occasion to decide if the one hundred surveillance jobs alone constituted a significant number under the statute." 357 F.3d at 1144. Similarly, in *Chavez v. Barnhart*, 126 F. App'x 434 (10th Cir. 2005), the court remanded because two of the jobs described by the VE conflicted with the Dictionary of Occupational Titles, and the ALJ did not have an opportunity to evaluate whether the 199 parking lot attendant jobs in the region, standing alone, existed in significant numbers. *Id.* at 436. In *Norris v. Barnhart*, 197 F. App'x 771 (10th Cir. 2006), the court remanded and directed the ALJ to consider the *Trimiar* factors because it was unclear whether he had found the numbers of each identified job, standing alone, to be significant in light of claimant's inability to sit for more than 45 minutes, which could preclude her from driving long distances to work. *Id.* at 777.

In *Stokes v. Astrue*, 274 F. App'x 675 (10th Cir. 2008), in contrast, the court held that no reasonable factfinder could determine that suitable jobs did not exist in significant numbers where there were 11,000 regionally available jobs and 152,000 nationally available jobs. *Id.* at 684. In *Rogers v. Astrue*, 312 F. App'x 138 (10th Cir. 2009), the court implied that 11,000

nationally available jobs was a significant number.  *Id.* at 142.  In *Raymond v. Astrue*, 356 F. App'x 173 (10th Cir. 2009), the claimant argued that a significant number of jobs must exist in the regional economy before an ALJ can avoid a disability finding and that 385 rental clerk jobs in the region was insufficient.  *Id.* at 177.  The court rejected the claimant's argument, holding that the controlling statutes, federal regulations, and case law all indicate that the proper focus is generally on jobs in the national, not regional, economy.[25]  *Id.*  The court further held that *Trimiar* does *not* hold that only regional jobs are relevant, or that a court must engage in a factorial analysis when the number of jobs available is much larger.  *Id.* at 178, n. 2.  Finally, in *Botello v. Astrue*, 376 F. App'x 847 (10th Cir. 2010), the claimant argued that the ALJ had failed to consider his traveling distance pursuant to *Trimiar* as directed by the court on remand.  *Id.* at 849-51.  The *Botello* court held that *Trimiar* did not require ALJs to engage in a multi-factorial analysis to assess whether there are significant jobs in the regional economy, and upheld the ALJ's significant numbers ruling based solely on the number of jobs the VE identified as available in the national economy.  *Id.*

The Court is persuaded that the ALJ was not required to do a multi-factorial analysis to assess whether a significant number of jobs Mr. Padilla could perform existed in New Mexico. *Raymond*, 356 F. App'x at 178, n. 2; *Botello*, 376 F. App'x at 850-51.  The ALJ considered Mr. Padilla's impairments, and gave due consideration to the education and experience of the

---

[25] The Court stated that in 42 U.S.C. § 423(d)(2)(A), for example, Congress prescribed that "[a]n individual shall be determined to be under a disability only if . . . [he cannot] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area . . . '[w]ork which exists in the national economy' means work which exists in significant numbers *either* in the region where such individual lives *or* in several regions of the country."  *Raymond*, 356 F. App'x at 177 (emphasis added); *see also* 20 C.F.R. § 416.966(c) ("We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy."); *Jensen v. Barnhart*, 436 F.3d 1163, 1168 (10th Cir. 2005) ("The Commissioner met her five-step burden of proving that there are sufficient jobs in the national economy for a hypothetical person with Jensen's impairments."); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (noting that the claimant must show his impairments prevent him from performing his past work, and then the burden shifts to the Commissioner to show that the claimant can perform work in the national economy)); *Hamlin v. Barnhart*, 365 F.3d 1208, 1224 (10th Cir. 2004) (noting that jobs need only exist within "the regional *or* national economy") (emphasis added)).

VE.  (Tr. 650, 653.)  There was no evidence that Mr. Padilla had limitations that would preclude him from traveling certain distances to work.  The VE identified jobs that were available in the national economy, not isolated, and specific to Mr. Padilla's RFC.  (Tr. 654.)  Finally, the VE identified 27,000 nationally available jobs in the aggregate, a number well above the 11,000 nationally available jobs the Tenth Circuit previously implied constituted a significant number. *Rogers,* 312 F. App'x at 142.  The Court will not disturb the Commissioner's final decision because it correctly applied legal standards and substantial evidence supports it.

### V.  Conclusion

For the reasons stated above, Mr. Padilla's Motion to Reverse or Remand for Rehearing is **DENIED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge**
**Presiding by Consent**